# EXHIBIT 3



**The INSTITUTE for Behavioral Sciences and the Law**

Office (954) 766-8826  
Fax (954) 764-3486

200 S.E. 6th Street, Suite 402  
Fort Lauderdale, FL 33301

## Psychological Evaluation
## (Downward Departure)

**Defendant's Name:** Christopher Scott  
**Case #:** 08-CR-10224-DPW  
**Evaluation Date:** 12-15-09  
**Report Date:** 03-05-10  
**Attorney:** Paul R. Mastrocola, Esquire  
**Examiner:** Michael P. Brannon, Psy.D.

**Forensic Summary:** The defendant reported and displayed numerous symptoms of depression and anxiety. In addition, he reported a history of symptoms strongly suggestive of Attention-Deficit/Hyperactivity Disorder (ADHD). In order to address the symptoms of ADHD, the defendant appears to have "self-medicated" with the daily use of marijuana prior to his arrest in May of 2008. The defendant also reported an obsession with computers since he was 10 years of age. In fact, he reported that as a teenager he spent 6-8 hours per day involved in various computer activities and that his sense of identity, self-esteem, and self-worth became directly related to his interactions with others regarding computer activities. If the Court were to consider treatment as a sentencing option in the current case, the defendant would be an appropriate candidate for placement into a long-term, residential, dual diagnosis program in order to treat symptoms of ADHD and marijuana abuse. If he were to successfully complete the designated residential program, he should be considered for a step-down to a day treatment or intensive outpatient program. Prognosis for a successful treatment outcome was determined to be good in regard the symptoms of ADHD and marijuana dependence. This optimistic prognosis is based upon defendant's high levels of insight, emotional distress, and considerable emotional support in the community.

**Referral Information:** Mr. Christopher Scott was assessed pursuant to a request from his attorney, Mr. Paul Mastrocola, for a psychological evaluation with treatment suggestions if clinically indicated. He was evaluated on the above date at this examiner's office at the Institute for Behavioral Sciences and the Law in Fort Lauderdale, Florida. He is scheduled for his next court date on 03-29-10.

**Sources of Information:** Clinical Interview; Mental Status Examination; Personality Assessment Inventory (PAI); Beck Depression Inventory – II (BDI-II); Miller – Forensic Assessment of Symptoms Test (M-FAST); Millon Clinical Multiaxial Inventory – III (MCMI-III); Inventory of Offender Risk, Strengths, and Needs; Statement of Ms. Charlotte Scott; Statement of Jessica Barker; and Statement of Ms. Sandra Scott.

**Confidentiality/Informed Consent:** The defendant was informed of the purpose of the current interview and the limitations of its confidentiality and he agreed to participate in the interview.

1

**Relevant Historical Information:** Mr. Scott is a 27 year-old, married, white male who was born in Miami, Florida. He reported that he was raised by his mother and father along with one sister. He reported that his father died in 2008 due to cancer. He reported that he was "very close" to his father and he further stated, "It is still very tough to deal with." He denied that he was ever abused or neglected during his formative years. In addition, he denied that he ever observed domestic violence between his mother and father. He reported a good relationship with all of his family members. He was not aware of any family history of mental health or substance abuse problems.

The defendant reported that he has been married for the past 18 months. He reported that he has been involved in an exclusive relationship with his wife for approximately 7½ years. He denied the occurrence of domestic violence in his marriage or any of his prior exclusive relationships. He reported that he is the father of one stepdaughter. The defendant reported that he was residing with his wife in Miami at the time of this assessment. He described his relationship with his wife and stepdaughter as "incredible... they are my life." The defendant's commitment to his family was corroborated in a written statement by his wife (Ms. Jessica Barker). He denied that he has ever been homeless or suffered from severe financial problems.

Academically, the defendant reported that he completed 11th grade in mainstream classes. He reported that he earned average grades in school. He reported occasional problematic behaviors in school including several suspensions. He reported that he was given a choice to leave school voluntarily or be expelled after disabling all of the school computers by spreading a virus from his home computer in 1999. He chose the former option and subsequently completed his General Equivalency Diploma (GED). The defendant revealed that he displayed inattentiveness, hyperactivity, and disruptive behaviors in school. In fact, the defendant reported that he "did marijuana everyday in high school so I could settle down and concentrate." He reported that he was bullied and excessively teased in middle school and high school, mostly due to obesity, social avoidance, and interest in computers. He reported that he had few friends in school.

Occupationally, the defendant reported that he was last employed in 2008 with Batteries Plus in Miami, Florida. He reported that prior to his arrest, he was employed in a computer company, although he indicated that he was fired and rehired due to his extensive computer skills. He denied that he has ever received Social Security disability benefits. The defendant denied that he has ever served in the United States military.

Legally, the defendant reported that he was previously arrested on charges including Possession of Cannabis, Loitering, and Grand Theft. The defendant reported that most of the above charges were dismissed. He denied that he has ever been sentenced to prison.

Socially, the defendant reported that he has one close friend. He reported that he associates with that friend on a frequent basis. Recreationally, he reported that he enjoys "playing video games and previously spending time on the computer." The defendant reported that he became interested in computers through his uncle when he was 10 years of age. He reported that his uncle used computers extensively in his business and "he showed me the insides of a computer for the first time." He reported that he became very interested in computers after his initial exposure by his uncle, and he stated, "I took them around with me everywhere and did things with them and I eventually made my own computer." The defendant reported that he visited numerous technological sites on the Internet, talked to people online, and set up various

2

advanced systems in his home. Mr. Scott reported that beginning in his teenage years and through the time of his arrest he was spending approximately six to eight hours a day on the computer. At times, he reported that he "stayed awake 2-3 days in a row to learn something new or to access information that was protected and that no one was supposed to able to get." The defendant reported that he "woke up feeling so good each day and I lost weight and was feeling more confident about myself." The defendant further stated that he had "...an alias online of UT for Untouchable. I had my own status there and it was like a fantasy world where no one could touch me and I had status and it was really different from how people would usually see me in real life. I felt really accepted by other people while on the computer or sometimes even when talking to them about computers in real life." The defendant's sense of belongingness and acceptance was corroborated in a written statement by his mother (Ms. Sandra Scott). The defendant reported that he initially "hacked into computers" for fun, although he later met his codefendant who convinced him to employ his computer skills for financially rewarding but illegal purposes. The defendant described his activities on the computer as "super-exciting" and "rewarding for the challenge each job presented." He described his activities on the computer as an "addiction" and he described clear withdrawal symptoms (e.g. – anxiety, irritability, loss of concentration) when he was not able to access his cellular telephone, PDA, and mini-computer. The defendant described his reactions to not being able to access the Internet for the past year as "super-depressed" and "worried about when I have done to my family." For example, the defendant reported that he was concerned over the likely effects of his absence from the family on their ability to maintain an adequate quality of living.

In regard to his mental health history, the defendant reported that he received psychiatric case management services when he was in 11th grade. He reported that he sought treatment due to his "marijuana problems." The defendant stated that he attended treatment sessions "3 or 4 times," and he was prescribed antidepressant medication (Wellbutrin). He reported that he self-terminated from that medication due to several side effects. He denied that he ever received any other form of psychiatric or psychological treatment services. He denied that he has ever attempted suicide. However, he reported that he has suffered from severe depression since the death of his father in July of 2008 and "best friend" in May of 2008. He reported that he continues to think about both of those individuals on a daily basis. The defendant reported that he has suffered from anxiety throughout his life including several panic attacks. He reported that his prior daily use of marijuana assisted in reducing his anxiety. He denied that he has ever experienced auditory or visual hallucinations. He denied that he was ever exposed to a traumatic incident. He denied anger control problems.

The defendant acknowledged the abuse of marijuana and alcohol. He further reported that he experimented with MDMA (Ecstasy) several times. He reported that he began to abuse substances when he was 17 years of age. At the time of his arrest, he reported that he was abusing marijuana on a daily basis. He reported that he mostly abused drugs when he was in the company of his peers. He identified his primary source of emotional support as his wife. He denied that he has ever received substance rehabilitation treatment services.

Medical health was reported as unremarkable as he denied any major injuries or illnesses. However, he reported that he was "knocked out one time in a club where a few people were trying to rob me." He denied any gross neurological symptoms such as dizziness, headaches, or seizures.

**Mental Status Examination:** The defendant arrived for this assessment on time and accompanied by his wife. He was appropriately groomed and attired in casual clothing. He was of average height and stocky build. He was oriented to time, place, person, and situation. His general clinical presentation was cooperative and his demeanor was serious. Motoric responses were hyperactive. Attention span was not within normal limits as he was easily distracted by extraneous stimuli. Memory functions were intact on brief measures of those cognitive skills. Affect was expressed in a full range and mood appeared anxious and depressed. Responses to examiner inquiries were appropriate in volume, rapid in pacing, and somewhat excessive in word production. He did not appear to be attending to imaginary internal stimuli and he did not verbalize any statements that would be suggestive of an active delusional belief system. The defendant denied suicidal or homicidal ideations or plans.

**Psychological Testing:** The Personality Assessment Inventory (PAI) is one of the most frequently utilized tests in forensic and clinical cases. It contains several Validity Scales designed to assess for possible response distortion and numerous Clinical Scales designed to assess for possible mental health problems. Validity Scales did not reveal any significant elevations on test scales designed to assess for fabrication/exaggeration of symptom severity. In addition, there were no indications of minimization of symptom severity or random responding to test items. As a result, Clinical Scales were determined to be valid and therefore interpretable. Clinical Scales revealed a significant elevation on a test scale designed to assess for substance abuse problems. Individuals who score in a similar manner usually report excessive use of illicit substances and possibly prescription medications. They are often known to be impulsive, emotionally labile, and self-destructive. Interpersonal relationships are likely to be superficial, and occasionally volatile with possible incidents of aggressive actions or threats. In addition, similarly scoring individuals tend to become more disinhibited while under the influence of substances, often leading to acts involving poor judgment and impaired reasoning. They frequently report that they have little ability to control their substance abuse or the negative effects that have occurred in various aspects of their lives. It is likely that they have encountered legal problems due to their abuse of substances.

The Millon Clinical Multiaxial Inventory – III (MCMI-III) is one of the most frequently utilized personality tests in clinical and forensic settings. MCMI-III Validity Scales did not reveal any significant elevations on scales designed to assess for fabrication/exaggeration of symptom severity, minimization of symptom severity, or random responding. As a result, Clinical Scales were determined to be valid and interpretable. Clinical Scales revealed significant elevations on the following test scales: substance abuse, anxiety, depression, and avoidant personality. Individuals who score in a similar manner are often known to abuse illicit and/or prescription medications and have suffered numerous negative consequences from that abuse. They also are likely to report high levels of tension, worry, and restlessness. On other occasions they are prone to reporting sadness, lethargy, and hopelessness. Moreover, as a general personality style, similar scoring individuals report fears of disappointment, criticism, and rejection. As a result, they often avoid conflicting or stressful situations. Additionally, they tend to reject novel challenges (unrelated to computers) due a lack of confidence and a fear of the unknown.

The Beck Depression Inventory – II (BDI-II) is one of the most commonly used brief assessment scales for symptoms of depression. The defendant's pattern of responses did not reflect random responding to test items. Therefore, the BDI-II was determined to be valid and therefore interpretable. The defendant obtained a total score of 20 on the BDI-II which is suggestive of a

4

Moderate level of depressive symptomatology. Individuals who score in a similar manner are often diagnosed with a major mood disorder.

The IORNS is a risk assessment tool that combines an analysis of static variables, dynamic variables, and protective factors as they relate to risk potential, treatment needs, and recidivism. The IORNS contains a Validity Scale designed to assess for Favorable Impression Management and Inconsistent Response Style. In addition, the IORNS contains Clinical Scales designed to assess for various factors that are associated with potential risk (including risk reduction factors). On the current testing, Validity Scales revealed a significant elevation on a test scale designed to assess for Favorable Impression Management. Individuals who score in a similar manner are often attempting to deny or minimize problem areas. As a result, PAI Index scores might be an underestimate of the severity of his actual psychological problems. Dynamic Need Scales revealed significant elevations on the following scales: Criminal Orientation and Intra/Interpersonal Problems. Protective Strength Index revealed a significant elevation on the following scale: Environmental Index. The IORNS yielded the following Index scores: Overall Index 53 (77th percentile), Static Risk Index 42 (30th percentile), and Dynamic Risk Index 54 (65th percentile). In other words, the defendant's risk potential for recidivism is mostly influenced by situational variables as opposed to chronic and severe personality traits. As a result, the defendant's amenability to risk reduction strategies appears to be good at this time.

The Miller Forensic Assessment of Symptoms Test (M-FAST) is a brief structured interview designed to assess an individual's probability of malingering psychiatric illness. Scores that exceed the established Total score cutoff of 6 are suggestive of malingered psychopathology. The defendant obtained a Total Score of 2 on the M-FAST. Individuals who score in a similar manner are rarely diagnosed with Malingering on more comprehensive measures such as the Structured Interview of Reported Symptoms (SIRS).

**DSM-IV-TR Diagnoses:**

| | |
|---|---|
| **Axis I:** | Panic Disorder NOS (without agoraphobia) |
| | Depressive Disorder NOS |
| | Attention-Deficit/Hyperactivity Disorder |
| | Cannabis Dependence Disorder |
| | Alcohol Abuse |
| | Substance Abuse NOS (MDMA) |
| **Axis II:** | Personality Disorder NOS (with avoidant and obsessive traits) |
| **Axis III:** | Head injury with loss of consciousness |
| **Axis IV:** | Legal |
| **Axis V:** | 55 |

**Conclusions:** The defendant meets the diagnostic criteria for several mental health disorders. In addition, he reported the chronic and severe abuse of marijuana until the time of his arrest in May of 2008. In fact, his actions at the time of the alleged offenses appear consistent with the impulsivity, impaired judgment, and poor anticipation of future consequences often observed in those conditions. In regard to the current allegations, the defendant reported numerous behaviors suggestive of obsessive thinking regarding the usage of his computer. Although this examiner is aware that the defendant reportedly engaged in illegal activities on his computer for which he earned financial rewards, his activities on the computer since the age of 10 revealed many

5

elements of addictive behaviors including exhilaration, tolerance, and withdrawal. He expressed remorse for his actions due to insight obtained through the process of maturation, and the negative impact of his actions upon his family. If the Court were to consider treatment as a sentencing option, the defendant would likely benefit from placement into a long-term, residential dual diagnosis program for treatment of ADHD and marijuana abuse followed by intensive aftercare services in the community. Prognosis for a successful treatment outcome was determined to be good as the defendant possesses many positive skills that could enhance his rehabilitative potential for a successful reintegration into society. In addition, the long-term objective of utilizing his considerable computer acumen in a more productive and beneficial manner certainly appears to be a realistically obtainable goal.

Thank you for the opportunity to participate in this interesting case and please feel free to telephone me if you require additional information on this matter.

*[signature]*

Michael P. Brannon, Psy.D.
Licensed Psychologist
PY0004289

1443923